210-0734 Brenda Cullinan v. Nissan, North America Good afternoon, your honors. My name is Tracy Jones, and I represent the petitioner, Brenda Cullhane, in this matter. We are before you asking you to reverse the commission's decision, which found that there was no causal relationship between medical treatment after June 15, 2004, as it relates to the repetitive trauma injury she suffered as of June 13, 2004. The standard of review for this case is manifest rate of the evidence. I have an extremely difficult burden in front of you today. I have to convince you, in order to get you to change this decision, that there's no evidence in the record upon which the commission's decision could be based. That's a refreshing acknowledgment, but go ahead. I'm here because I actually can do that in this case. The facts of the case are very simple. She had sustained a repetitive trauma injury from the use of an ill-fitting wire harness. Now, this is a harness that goes over the entire body, loops around the legs and the arms. It's got a buckle in the back that then gets attached to a cable that hooks to a forklift truck so that if she's in the air and falls, she doesn't fall to the ground. The harness repetitively beat her against the back of her neck and her upper back. In addition to that, she used a malfunctioning forklift truck that jostled her significantly throughout her work activities. She presented to the emergency room because she had a progression of back thoracic, lumbar and thoracic, and cervical pain. She was diagnosed with a back strain and was told to follow up with her primary care physician. She did that on June 15, 2004. That was Dr. Cavanaugh. The commission said that because three factual findings were made, which I'll go into in a second, medical treatment after that visit with Dr. Cavanaugh was no longer related to the work injury. Each of those three factual findings upon which they made their legal conclusion regarding causation are contradicted by the evidence and are not supported by anything in the record. And one of them was the harness, correct? Yes, sir. That was number one. It's your position there's no evidence that the harness was replaced. That is correct. What about the report of Dr. Herman? Dr. Herman performed an independent medical evaluation on March 25, 2004. Dr. Herman noted in there that he had received information that the harness had been replaced. In fact, at one point, he even quotes that she said it had been replaced. He doesn't date that as to when she indicated that. He references when she had returned back to work. And there's further issue about times off following that initial period from June 14 to June 17 of being off work. But Dr. Herman doesn't have any other information that the harness was replaced. And he also doesn't know exactly when the harness was replaced. Now, the commission also relies on the report from Dr. McNally, who referenced the harness had been replaced. If you know in Dr. McNally's note, he actually cites a medical note which is undated and signed by Dr. Jimenez, which is not in evidence in this case. There's no indication in McNally's report as to when the harness had been replaced. All the evidence that actually is here before you with regard to whether or not the harness was replaced shows that it hadn't been replaced until she was taken off of work in February of 2005. And I'll point to testimony. It's in the record on page 120 from the petitioner that said in February of 2005, her pain had gotten so bad she couldn't take it anymore because she had continued to work and continued to be harmed by the harness. It's at that point that she was taken off of work and underwent aggressive medical treatment, including three back surgeries. Did the claimant ever testify herself whether the harness had been replaced or when it had been replaced? Is that in the record? The petitioner did not say on this specific date the harness was replaced. But she did reference in multiple places that she continued to work through February of 2005 with the ill-fitting harness. And remember, that's not the only thing that was causing her pain according to all the doctors. It was also the malfunctioning lift, which there's no evidence was ever changed. She testified she continued to use the same equipment until taken off of work in February of 2005. I'll move on to this. When did she first inform her supervisor that she had an ill-fitting harness? She informed her supervisor by her testimony in February of 2005. There is a reference in the record. And actually, it's page 147. There's reference to Mr. Alberstadt. That was a respondent's witness. He testified that she had told him about the ill-fitting harness and that he had contacted the work comp carrier. And it's dated in there to be June of 2004. But he didn't go on to testify that he had it replaced in June of 2004. And later in his testimony, nine pages later actually, so that would be 154 approximately, he testified that work comp didn't start paying TTD benefits until February of 2005, because that's when her condition had worsened and she went off of work for surgery. So Mr. Alberstadt, respondent's witness, confirmed the harness had been replaced. He never testified that it was. That, coupled with the petitioner's testimony, and in light of Dr. McNally's note that doesn't date the reference to replacing the harness, and coupled with Dr. Herman's IME report, that also doesn't date when the harness was replaced. I don't think, based on those facts, that you can draw a conclusion that the harness was replaced. Well, what did Dr. McNally mean when he wrote that, from what I understand, the warehouse supervisor did not fit her for the new harness and got one for her. However, according to her, in our conversation, that did not occur until approximately one month after she informed her immediate supervisor of the original poor-fitting harness. So what's one month after the date she informed them? When did that happen, what dates are we talking about? You're actually referring to Dr. Herman's IME report? No, I'm talking about Dr. McNally's note. Okay, first of all, it does not date the time off of work. If you know, in the medical- I don't wanna know the time off of work. She said here, in our conversation, he gave her a new harness, he got her a new harness, one month after she informed her immediate supervisor of the original poor-fitting harness. So when did she say she informed her original supervisor of the ill-fitting harness, what date? February 2005, by her testimony. So, according to this, it was replaced by March of 2005. Correct, but the commission found it had been replaced by the date of her primary care physician's appointment on June 15, 2004. Because remember, the commission said her condition was only temporary because she didn't sustain any ongoing problems because the harness had been replaced. And so the commission made the assumption, or the factual conclusion, that it was replaced in June of 2004, not February of 2005. When did she go to the emergency room, June 13th of what year? 2004. Herman's report says she said that she complained to her boss and he did not initially obtain a new harness until she developed severe neck pain on June 11th and ended up in the emergency room on June 13th. She said that when she returned to work, she had a new harness. When did she return to work after hospitalization? On June 13th of 2004. The records show, and I think counsel would stipulate, that she was off June 13th to June 17th, 2004. So the ER visit through the 17th. But you will note that she actually was off from the 14th to the 17th for an unrelated medical condition, that being depression, not for the back injury. She was not taken off for the back injury until February of 2005. I'm only concerned about when she actually returned to work. Because according to Herman's note, she had a new harness when she returned to work and had it between the 17th and 2004. And Dr. Herman received that information. He indicates from her in a conversation she testified inconsistent with that. There's no other evidence in the record that that's the case. And respondents' own witness confirmed that that was not the case. Well, I mean, but the point of the matter is it is in Herman's report. It is, just like the references in Dr. McNally's report. But again, it's unbated. Isn't it up to the commission which one they choose to believe? Yes, Your Honor. They can choose whether to go with an IME physician or a treating physician. And I'll actually draw your attention to that specific issue. Remember that the commission also made a factual finding that she, excuse me, that there was no history in the medical records of a work injury. And in the decision, they specifically put a lot of emphasis on Dr. Herman's report. Dr. Herman, if you read his report, went through and said, this lady used a harness. She had a malfunctioning forklift, which, again, was never replaced. She suffered low back, thoracic, and cervical spine pain. She required medical treatment. He recommended that she undergo a cervical fusion from C4 to C7. He specifically said in that report, I can't address causation because I need to see her prior treatment records. This is records prior to June of 04 where she treated with a chiropractor. And he had said, if those records are produced, and if they show that she had atrophy, which he had noted on his exam, prior to the work injury, then there wouldn't be causal connection. You can infer that he would say, if those records didn't show atrophy, that there would be a causal connection between the need for the cervical fusion and the work injury. He specifically asked for those records. This is a respondent's IME who gets his report. And they look at it, and they see that he's asking for those records. They know that if those records show atrophy, they're getting a good report in March of 05 that says none of this is work related. The respondent did not produce those records to Dr. Herman and ask him for an addendum report. Why? Number one, because they probably assumed that the records didn't show atrophy, and he would have said it was causally related, and they would have been stuck with that opinion. You can infer the lack of their evidence, so their failure to submit that evidence to Dr. Herman and get another report, you can infer that he would have opined that it was a causal connection. If the commission wants to put so much weight on Herman's report, they should have drawn the same conclusion that there is a causal connection. In addition to the causal connection, you raised some other issues. You want to touch on those briefly? Sure. With regard to causal connection and the medical records, remember that the commission specifically said that because there wasn't a history of the work injury in the medical records until February of 05, that's one of the reasons why they said there was no causal connection after June 15, 2004. Ms. Culhane at trial testified, I thought maybe in June of 04 that it was due to the harness and the forklift. I wasn't sure. But by February of 05, and this is on cross-examination, she said by February of 05, I knew that was the cause of my injury. Classic Duran situation. Manifestation of a repetitive trauma injury. She says in February of 05, I knew that was the cause for sure. And every medical doctor who saw her subsequent to them said that was the cause. There's the history, and yes, it's causally related. And that includes all the IME physicians with the exception of Dr. Zellwey. That is very significant because the commission says, hey, there's no record of the work injury. Well, couldn't the commission find the opinions of Drs. Herman and Zellwey to be more persuasive than the physicians you referred to? Absolutely. But remember, with regard to Dr. Herman, I go back to my prior response. Dr. Herman said, I can't address causal unless you give me the prior records. They didn't give him the prior records. The inference you can draw from that is that it's because he would have noted no atrophy and would have given a causal connection. So again, you can give a lot of weight to Dr. Herman's report, and you can infer that from his report. Dr. Zellwey's report is flawed for the exact same reason that the commission's decision is flawed. Zellwey also assumed, number one, the harness was replaced right away. Number two, that there was no history in the medical records initially, so it's not causally related. And number three, that she was off work for a significant period of time in 2004. All of those three facts are against the manifest weight of the evidence. So Zellwey's medical opinion, which is based on those three facts, is also not credible. So basically, in essence, you're saying is that their opinions are flawed because they're based on flawed factual determinations? Yes, sir. If you have three factual findings upon which you base a legal conclusion, and those factual findings are inconsistent with the record and against the manifest weight of the evidence, the legal conclusion you draw from those is likewise flawed. Now, you can, and I will be plain devil's advocate, basically, you can sit here and say, all right, if we don't focus on those three things, is there still evidence in the record upon which you can assume the commission would have relied? And the answer to that is, only Zellwey's opinion could be relied on at that time. And again, the same thing. His opinion is based on three facts that are inconsistent with the records. Your Honors, unless you have additional questions for me at this time, I will just reiterate that I ask that you reverse the commission's decision with regard to causal connection. Find that there was a causal connection between her medical treatment following June 15, 2004 and the original repetitive trauma injury she sustained as of June 13, 2004, and ask that you remand it for further orders on the other issues. Thank you. Counsel, please. Good afternoon, Your Honors. Counsel, may it please the court, my name is Joseph Needham, and I represent Nissan North America in defense of this appeal. We ask that you affirm the commission's decision in its entirety, because there is no part of the award that is against the manifest weight of the evidence, the opposite conclusion is not clearly apparent, and the appellant can't meet her burden to compel a reversal of the commission's decision. The commission found that the employee sustained a temporary and minor aggravation of a pre-existing cervical condition. They base that on the petitioner's, I'm sorry, on the injured worker's testimony, and a medical record of June 14, 2004 by Dr. Kavanaugh. They also find that the condition resolved by June 17 of 2004, based upon the records of Dr. Kavanaugh, where Dr. Kavanaugh releases the injured worker from care, releases the worker to return back to work as of June 17 of 2004. The commission's decisions, their findings, are supported within the record, mostly by the injured worker's own medical records, particularly for the medical records that predate February of 2005, and by the opinions of two examining physicians, Dr. Herman and Dr. Zelder. Well, let me just stop you right there. You heard her argument. She's acknowledging that ostensibly there is evidence in the record to support the findings of the commission, but the doctors you're referring to's opinions were flawed because they were based on inaccurate factual determinations. They were not flawed. There was no inaccurate factual determinations. Because what my opponent is relying on to make that argument is the claim that the harness was never replaced prior to February of 2005. Dr. Jimenez's records specifically state otherwise. They are recorded by Dr. McNally. There are actually four doctors that record that the harness had been replaced. They're Dr. McNally, citing Dr. Jimenez, Dr. Herman, and uh... He puts it at a different date than McNally's records do. And to the extent that the injured worker could not identify when this harness was replaced, couldn't determine whether or not it was a month after February of 2005 or a month after June of 2004, we essentially have to look to the records. Well, it would have been June the 17th because the record says it was replaced when she returned to work. She returned on the 17th, didn't she? Or did she return on the 18th? That's not specifically clear within the record. And that's a point that my opponent is going to have to clarify if they're going to claim that there's error in that circumstance. But they really can't clarify. I think she tacitly acknowledged the petitioner, the injured worker herself never testified as to a specific date. Correct. We can only deduce it. And you can deduce it by either the claimant's testimony, which I would find unreliable, or you can deduce it from the medical records. The medical records indicate roughly June of 2004 as to when the harness was replaced. It's not my position to clarify the record. It's not what I'm attempting to do. It's not what I claim to be capable of doing. The record is not entirely clear. The confusion arises when the claimant testifies that it was sometime after February of 2005. And by the way, we're given the February of 2005 date as a date when the claimant went off of work because of excruciating back pain, is what I believe we were told today. No, not so. Claimant went off of work in February of 2005 because she had a heart attack. That's actually her testimony. In February of 2005, she had a heart attack. And at that point, she essentially decided that her condition was work-related. We asked her, pardon me, we asked her, I asked her, what is it that you, what gave you this revelation that in 2005, when you're off of work for a heart attack, that everything that preceded it, all of your treatment that preceded it, and now all of your treatment subsequent, is related to a harness at work? She didn't have an explanation. She couldn't give an explanation because there's not an explanation. And we were also given the characterization of a harness with a buckle that repeatedly beat her in the back of the neck. I don't think you'll find that description in the claimant's or in any of the medical records. She had an ill-fitting harness that she claims was hitting her in the back of the neck. Never is it claimed with such severity as we were given today. But all of the commission's findings are supported by the treatment records. And I will reiterate that my opponent's focus on records that do support her position misses the issue. The question isn't whether or not there's some support for the appellant's position. The question is whether there's no support for the commission's findings. And that is not the case in this circumstance, especially if you look to the claimant's medical records. She was released from care June 17, 2004. She was released to return back to work. Whether or not she did is also not clear within the record. But why was she released at that time? Because her condition had resolved. Why was she sent back to work? Because her work wasn't damaging her body. The old joke, doc, it hurts when I do this. Well, don't do that. If it hurts because you're going to work, if something that you're doing at work is causing your injury, they don't send you back to work. The fact that her condition resolved by June 17, 2004 is contained within her medical records. Not just the June 17, 2004 records, but her subsequent treatment records in July, early July, I believe it's the 12th and the 21st, she treats for depression, not for cervical conditions. When she treats with Dr. Navid on July 22nd, roughly five weeks or so after the claimed event, she's not treating for her cervical condition. She's treating for her lumbar condition. That's also noted by the commission. And it's noted that to the extent that she's no longer seeking treatment for her cervical condition for at least five weeks after the injury, her condition has resolved. That's why her treatment and her, that's why her treatment was found not compensable, not related to the work injury after that point. Your Honor, I have a question. Would it be your position, the commission's presented with some conflicting medical opinions regarding the relationship between the claimant's condition of well-being after June 17, 2004 and her activities at work, and it's up to the commission to weigh to the evidence and the credibility and strength of the evidence? Correct. That is essentially, that's the case of Orsini versus the Industrial Commission. But if you look at the reason why these opinions are more credible, you need only determine, just look into how they're obtained. Several years after the work event, the claimant is telling her doctors that this relates to an injury that I sustained at work in June of 2004. So that's what they record. If you tell them that your arm pain or whatever injury you sustained relates to a specific event, they will then record it, and they will relate it to that specific event. What you have to look to in determining whether or not that's credible is the roughly nine months of treatment that the claimant undertakes before she first ever claims it's a work injury. After being released by Dr. Kavanaugh's care, she has July 12 with Dr. Morrison, July 21 with Dr. Morrison, July 29, August 2, August 26, September 9, September 23, September 24, October 22, December 23, January 25 of 2005. She never once says work is the cause. She does specifically deny that work is the cause. On August 26, 2004, she informs Dr. Klock, signs her name, dates it, checks a box that says her condition is not work-related. Now, in my opponent's reply brief, they take issue with that and claim that's not an admission of anything, because that's complaints regarding her shoulder condition, not her cervical condition. Well, if you compare the two, she's treating for the exact same body part and complaints in August 26 of 2004 that she did in June of 2004. In June, it was upper back pain, shoulders and neck are tight. In August, it was trapezius and upper shoulder pain. Same body parts. Those were also cervical distributions. And on that date, she signs her name and says these are not work-related conditions. And by the way, what is she diagnosed with August 26 of 2004? Cervical arthritis. How could she possibly claim that it's not the same body, not the same body part as the cervical surgery that she subsequently received? And I do want to mention something about the timeline here. We're told about a work harness causing the injury. Well, that work harness causing the injury doesn't resurface until February of 2005. And I'll reiterate, February of 2005, she goes off of work for a heart attack, not because of her back. That's in the record. That's even in her testimony. But before February of 2005, no explanation, no claim of a work injury within the medical records. From February of 2005 until roughly August of 2007, she's telling her doctors that it was a harness. By August of 2007, then it becomes a harness and a jarring lift truck. By the time she gets to testimony, she's testifying, well, it's a work harness and it's this lift truck that jostles me around. But if you look at when she starts claiming that, she doesn't claim the work harness until February 2005. It's another two years before she adds the shaking lift truck to it. There's ample support for the commission's decision. I do want to take issue with one other claim, though. In my opponent's brief, she claims within the brief that after July of 2004, there's a consistent history of work as the cause. And the next paragraph begins that history with Dr. Koh's report, which again doesn't take place for another three years. Dr. Koh doesn't get involved until about three years after this event. We have almost a year of medical records showing absolutely no claim of a work injury, showing in August 26, 2004, specific denial to which she signs her name of a work injury. Then in February of 2005, she decides. And she can't tell us how it is she decides that work was the cause. As best I can paraphrase her testimony was, well, I'm not a medical doctor. That is completely telling about what this case is. We have an individual who, roughly a year after a very minor cervical aggravation, decides that the host of conditions that she's dealing with now are all related to a harness that she wore at work. She renders that determination when completely unrelated heart attack. Even at trial, she didn't claim the heart attack was related. Thank you, counsel. Thank you. Your bill, please. Your Honors, counsel indicates to you that Dr. Kavanaugh released her as of June 17, 2004 from care and returned to work full duty, and that is not accurate. If you review the June 15, 2004 report, he referred her to medical pain management. It's clear as day in the record. There's no dispute about it. She then saw Dr. Klock, who was the pain management physician at Valley West. He didn't release her and say that she had reached MMI and she was able to go home after her very minor and temporary injury, as counsel calls it. Instead, he said, you need more treatment. I can't handle it. Go to pain management. He referred her to pain management. Counsel, how do you respond to his argument that the claimant claimed a consistent history of a work injury and yet signed a document acknowledging that at that time, the condition she was being treated for was not related to work? How do you respond to that point? My response is that was a standard form required by the doctor's office to process the claims through her group insurance. The employer is self-insured, which isn't really relevant. But in order to get someone to pay, they've got to check a box. If you look at the actual history taken from the petition, or with each of the doctors, she says it is work-related. And remember that she didn't know for sure whether it's work-related until February of 2005. And counsel asked, well, why that magic date? Why February of 05? She couldn't explain it. However, it's clear that by then, she had seen a few doctors, probably discussed these things with the doctors. In February of 05, Dr. Naveed, who had been treating her in July of 04, said in his records it was causally related to the use of the harness and the forklift at work. It's then that she has these conversations with the doctor. It's then that she realizes, yes, this is work-related. Yes, it's caused by the harness and the forklift. Prior to then, she's got a problem. She's got pain. She wants to get better. She wants to get back to work. She goes for treatment. She knew the harness was hitting her in a fairly forceful manner. I mean, she knew there was a problem with the harness. Absolutely. But making the jump that that causes your pain, other than basically surface pain or muscle pain, that's a stretch to some people. Most laypersons and workers are not as experienced or versed in medical terminology. They may not know that, and most doctors would agree with that statement. Now, I do want to go back to your question about that reference in Dr. Herman's report about the harness being replaced when she returned back to work. If you go to the request for hearing form in the record, you will note the respondent stipulated that for the work-related injury, she was not off of work until February 15. She returned to work June 5, 2006. That's stipulated by respondent at trial. So Dr. Herman's reference, I don't know if that's the date he's referring to, June 5, 2006, or if he's referring to June of 2004. But you asked me specifically, when was she off work and when did she go back to work?  by stipulation of the parties at trial. Lastly, your honors, unless you have any further questions for me, again, I think if you look at all of the evidence, and weigh Dr. Herman's opinion highly, just like the commission did. But look at what Herman did. He said, I just need to see those other records to see if this is quasi-related. He asked for them. He said what he's looking for in those records to say it's not work-related. The respondent did not send those records to him. Why? You can infer because they knew he was going to say it was quasi-related. You can give him as much credit as you want and infer that same conclusion. Then the only medical opinion that says this isn't work-related is that opinion from Dr. Zelby. Because every other treater, every other IME physician said this was quasi-related and the three surgeries related. Thank you. Thank you, your honors. We'll take the matter under advisement. We're just positioned to say.